```
            IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF PENNSYLVANIA
```

THE SHAW GROUP INC. and        )
SHAW ENVIRONMENTAL &           )
INFRASTRUCTURE, INC.,          )
                               )
          Plaintiffs,          )
                               )
     v.                        )   Civil Action No. 02-1749
                               )
PICERNE INVESTMENT CORPORATION,)
                               )
          Defendant.           )

<u>MEMORANDUM</u>

I

In this diversity action, plaintiffs, The Shaw Group, Inc. ("The Shaw Group") and Shaw Environmental & Infrastructure, Inc. ("SEI"), seek damages from defendant, Picerne Investment Corporation ("PIC"), for breach of contract and breach of the implied covenant of good faith and fair dealing, as well as declaratory relief. Presently before the Court is PIC's motion for summary judgment pursuant to Fed.R.Civ.P. 56. For the reasons set forth below, the motion will be granted.

II

For purposes of the present motion, the following facts are undisputed:

In 2000, PIC and IT Group, Inc. and its subsidiaries (collectively "IT") formed a joint venture to pursue privatization contracts with the United States for the design, construction and maintenance of military housing units (the

1

"Military Housing Joint Venture"), including a privatization project for the United States Army in Ft. Meade, Maryland (the "Ft. Meade Project"). (Pls' Concise Statement, ¶ 16).

In late 2001, PIC became concerned about IT's deteriorating financial condition. Due to concerns that the United States Army would withdraw its stated intent to award the Ft. Meade Project to the Military Housing Joint Venture if IT filed a petition in bankruptcy, PIC approached IT about purchasing IT's interest in the Military Housing Joint Venture. Initially, PIC proposed an outright purchase of IT's interest with no option for IT to re-purchase its interest post-bankruptcy. IT rejected this proposal and insisted that any sale of IT's interest in the Military Housing Joint Venture to PIC include an option providing for IT's repurchase of its interest post-bankruptcy or allowing the purchaser of IT's assets in bankruptcy to purchase IT's interest. (Pls' Concise Statement, ¶¶ 17-18).

On December 28, 2001, PIC and IT entered into a Repurchase Agreement pursuant to which PIC granted to IT "and its permitted successors and assigns,"[1] the right to re-purchase IT's interest

---

[1] With respect to "permitted successors and assigns" of IT, the Repurchase Agreement provides:

\*   \*   \*

Until July 30, 2002, the Call Option shall be the exclusive right of IT, and none of the PIC Companies shall sell or assign the Transferred Interests or any of their respective interests in the Transferred Entities or

in the Military Housing Joint Venture on or before July 30, 2002 (the "Call Option"), if the following conditions had been met: (1) IT had been discharged from bankruptcy pursuant to a plan of reorganization under Chapter 11 of the United States Bankruptcy Code or in the case of a permitted successor or assign, such entity was not then subject to a petition in bankruptcy; (2) IT or a permitted successor or assign met certain specified financial conditions; and (3) the United States Army and any lenders to the Military Housing Joint Venture consented to the exercise of the Call Option after a joint presentation by PIC and IT (or a permitted successor or assign) regarding the merits of allowing the Call Option to be exercised. The "Re-entry Price" included, *inter alia*, 50% of the costs incurred and fees paid by PIC for proposal preparation, and 50% of the costs incurred by PIC to pursue projects for the Military Housing Joint Venture

---

> hereunder to any person or entity.  IT's rights under this letter agreement may be assumed by IT under the Code but shall not be assignable except to an entity (a "permitted successor or assign") *which purchases all or substantially all of IT's privatization business* (including a subsequent purchaser thereof), and in any such case (1) all references to IT herein shall refer to any such purchaser, and (2) the PIC Companies shall recognize such purchaser's rights hereunder *provided that any such purchaser shall assume in writing IT's rights and obligations hereunder* and under all other agreements relating to the Transferred Entities. (Emphasis added).
>
> \* \* \*

(Df's Concise Statement, Exh. A, p. 3).

3

from the date of the Repurchase Agreement to the date of the closing of the Call Option. (Df's Concise Statement, Exh. A).

Subsequently, on January 4, 2002, PIC and IT entered into a Transfer Agreement pursuant to which IT transferred its interest in the Military Housing Joint Venture to PIC for $2.2 million.[2] (Df's Concise Statement, Exh. B). Shortly thereafter, IT filed for bankruptcy under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. (Pls' Concise Statement, ¶ 28, Df's Concise Statement, ¶ 2).

On January 23, 2002, IT and The Shaw Group entered into an Asset Purchase Agreement pursuant to which The Shaw Group agreed to purchase certain assets of IT, including all or substantially all of IT's privatization business. (Pls' Concise Statement, Tab H). The Asset Purchase Agreement specifically provided that The Shaw Group assumed the rights and obligations of IT under the Repurchase Agreement with PIC. (Pls' Concise Statement, Tab H, Schedule 1.01). On April 25, 2002, the Bankruptcy Court entered an Order approving the Asset Purchase Agreement between IT and The Shaw Group and authorizing, *inter alia*, the sale of substantially all of IT's assets to The Shaw Group free of liens,

---

[2]$2.2 million was the sum of money IT had invested in the Military Housing Joint Venture as of January 4, 2002. It did not include any anticipated profits. (Pls' Concise Statement, Tab B, p. 39).

4

claims, interests and encumbrances. (Pls' Concise Statement, Tab K).

On May 1, 2002, Shaw California, LLC ("Shaw California") was formed as a Louisiana limited liability company.[3] (Pls' Concise Statement, ¶ 4, Df's Concise Statement, Exh. D). Two days later, on May 3, 2002, a Bill of Sale, Assignment and Assumption Agreement was executed by IT and Shaw California, as The Shaw Group's designee, transferring right, title and interest in the assets that were the subject of the Asset Purchase Agreement between IT and The Shaw Group (which included the Repurchase Agreement between PIC and IT) to Shaw California.[4] In this regard, the Bill of Sale, Assignment and Assumption Agreement provides:

\* \* \*

> 2. In accordance with, and with all of the protections afforded by Sections 105(a), 363, 365 and 1146(c) of the

---

[3]In April, 2002, shortly before the formation of Shaw California, SEI and Shaw Environmental, Inc. were incorporated in the State of Louisiana. SEI is a subsidiary of The Shaw Group. Shaw Environmental, Inc. is a subsidiary of SEI and the sole member of Shaw California. (Pls' Concise Statement, ¶¶ 3-4, Df's Concise Statement, Exhs. C and D).

[4]With respect to The Shaw Group's designation of Shaw California to take title to IT's assets in the Bill of Sale, Assignment and Assumption Agreement, the Bankruptcy Court's April 25, 2002 Order approving the sale of substantially all of IT's assets to The Shaw Group specifically provided that "[a]t or before Closing, [The Shaw Group] may designate one or more Designees to take title to the Assets...." (Pls' Concise Statement, Tab K, p. 15).

> Bankruptcy Code, [IT] hereby sells, grants, assigns,
> conveys, transfers and delivers to [Shaw California], to the
> extent authorized by the Sale Order, all of [IT]'s right,
> title and interest in and to the Assets (other than [certain
> irrelevant assets]), free and clear of any Encumbrances
> other than the Permitted Real Property Encumbrances
> (collectively, the "Purchased Assets"), TO HAVE AND TO HOLD
> the Purchased Assets unto [Shaw California], its successors
> and assigns, together with all and singular the rights and
> appurtenances thereto in any wise belonging, subject,
> however, to the terms and conditions stated in this
> Agreement, forever.

\* \* \*

(Df's Concise Statement, Exh. E).

By letter dated May 13, 2002, counsel for The Shaw Group and its subsidiaries notified Mr. John Picerne, PIC's Executive Vice President, that representatives of The Shaw Group and its subsidiaries would be contacting him in the near future to discuss the procedure for exercising the Call Option in the Repurchase Agreement. (Pls' Concise Statement, Tab B, p. 7 and Tab M).

On June 28, 2002, Daniel J. Shapiro, SEI's Executive Vice President, sent a letter to PIC's counsel, Stephen Carlotti, Esquire, in which he noted that after his persistent attempts since May 3, 2002 to schedule a meeting between Mr. Picerne and SEI's President, Mr. T.A. Barfield, Jr., a meeting finally had been scheduled for July 12, 2002 at Mr. Picerne's office in Providence, Rhode Island. In the letter, Mr. Shapiro indicated that SEI needed to review certain materials before the July 12th meeting which had been requested but not yet received, including

documents relating to the Ft. Meade Project.[5]  (Pls' Concise Statement, Tab N).

By letter dated July 3, 2002, Attorney Carlotti responded to Mr. Shapiro's June 28th letter, stating that PIC would make available the closing binder for the Ft. Meade Project as soon as it was received from the lender's counsel.  In the letter, Attorney Carlotti also noted that there were a number of conditions precedent to the exercise of the Call Option in the Repurchase Agreement, including certain financial requirements which had to be met and approval by the United States Army and the lenders.  (Pls' Concise Statement, Tab O).

In an undated letter to Mr. Picerne following the July 12, 2002 meeting in Providence, Rhode Island, Mr. T.A. Barfield, Jr., SEI's President, noted PIC's failure during the meeting to indicate that it intended to fulfill its obligations under the Repurchase Agreement.[6]  He concluded the letter as follows:

---

[5]Contrary to the Bill of Sale, Assignment and Assumption Agreement dated May 3, 2002, pursuant to which right, title and interest in IT's assets were transferred to Shaw California as the designee of The Shaw Group, in his June 28th letter, Mr. Shapiro states that SEI was seeking to obtain all interests formerly held by IT in the Ft. Meade Project as the assignee of IT.  (Pls' Concise Statement, Tab N).

[6]In this regard, Mr. Barfield stated: "In fact, our understanding is quite the opposite - that Picerne is taking the position that Shaw is not entitled to exercise the Call Option (as defined in the Repurchase Agreement), and that consequently Picerne does not intend to cooperate with Shaw."  (Pls' Concise Statement, Tab P).

> "Please advise us as soon as possible regarding your intentions. If Picerne has not begun to comply with its obligations under the Repurchase Agreement by July 17, 2002, or if Picerne continues in its current course of obstructing the process and refusing to cooperate with Shaw as required by the Repurchase Agreement, Shaw will be forced to consider all of its alternatives to protect its business interests, including but not limited to taking action against Picerne in the Bankruptcy Court or another appropriate forum."

(Pls' Concise Statement, Tab P).

On July 16, 2002, Attorney Carlotti sent a letter to Mr. Barfield indicating that he had been asked by Mr. Picerne to respond to Mr. Barfield's undated letter. In the July 16th letter, Attorney Carlotti denied Mr. Barfield's claim that PIC had delayed or refused to meet with him, stating that the meeting was held "as soon as it was reasonably possible to do so." Attorney Carlotti also denied Mr. Barfield's claim that PIC indicated an unwillingness to fulfill its obligations under the Repurchase Agreement during the meeting, stating: "There was nothing in Friday's meeting to indicate that Picerne will not stand by the terms and conditions of the [Repurchase Agreement]

to the extent that agreement remains in force and effect."[7]

Attorney Carlotti concluded his July 16th letter as follows:

> "Notwithstanding the foregoing, Picerne stands ready to provide information to you subject to receiving assurances on confidentiality. Accordingly, we are enclosing herewith a standard confidentiality agreement under which Picerne will provide you information concerning the financing package at Fort Meade. The materials will be available to you at any time after we have received a signed copy of the confidentiality agreement for inspection in our office by your representatives."

(Pls' Concise Statement, Tab Q).

On July 25, 2002, Mr. Barfield wrote a letter to Mr. Picerne to thank him for certain information that had been provided by PIC over the previous several days, but also noting that PIC had failed to provide "a substantial amount" of requested information. In this connection, Mr. Barfield stated:

> "Picerne's refusal to provide us with information, which we have been requesting since January 2002, has caused significant problems. Among other things, Picerne's failure to cooperate and refusal for several months now to provide access to Picerne personnel and information has prevented Shaw from determining whether to exercise the Call Option. Additionally, Picerne still has not provided us with information sufficient to allow us to even determine the

---

[7]With respect to Attorney Carlotti's representation that PIC was willing to fulfill its obligations under the Repurchase Agreement "*to the extent that agreement remains in force and effect,*" he also stated: "As indicated to you in the meeting on Friday, under the terms of the underlying agreement, part of the consideration for which was the [Repurchase] Agreement, IT Corporation was required to turn over a substantial amount of documentation to Picerne, most of which was never received. Picerne, as a result, incurred substantial additional costs. IT was put on notice of its failure to comply with that agreement and we never received a reply to our notice." (Pls' Concise Statement, Tab Q).

> amount of the Re-entry Price, as that term is defined in the Repurchase Agreement. (As you know, the Re-entry Price includes such things as 50% of certain costs paid by Picerne following execution of the Picerne-IT Transfer Agreement, and Picerne, despite our multiple requests, has failed to provide us with either the amount of those costs or documents sufficient to determine them). Simply, and bluntly, put, Picerne repeatedly has delayed and obstructed Shaw and has still not adequately complied with its obligations under the Repurchase Agreement."

Despite the foregoing claims, Mr. Barfield indicated that SEI would exercise the Call Option if the requested information was provided by PIC and the Re-entry Price was acceptable to SEI.[8] (Pls' Concise Statement, Tab R).

On July 29, 2002, the day before the expiration of the Call Option in the Repurchase Agreement, Attorney Carlotti responded to Mr. Barfield's July 25th letter. First, Attorney Carlotti indicated that PIC was "surprised" by the "tone" of Mr. Barfield's July 25th letter, as well as its alleged "inaccuracies" regarding PIC's failure to provide requested documents. Second, Attorney Carlotti reminded Mr. Barfield of the conditions precedent in the Repurchase Agreement, including the requirement that certain financial conditions be met before the Call Option could be exercised and the requirement that the United States Army and the lenders consent to the exercise of the Call Option. Third, Attorney Carlotti indicated that PIC had

---

[8] Mr. Barfield concluded the July 25th letter by reiterating SEI's intent to take legal action against PIC in an appropriate forum if PIC continued to refuse to cooperate in the exercise of the Call Option. (Pls' Concise Statement, Tab R).

"tried to cooperate ... to the greatest extent possible" notwithstanding the following facts: (1) the Repurchase Agreement was part of the consideration for the Transfer Agreement between IT and PIC and IT breached the Transfer Agreement by failing to provide certain information to PIC; (2) under the terms of the Repurchase Agreement, PIC was not required to provide any information as a condition precedent to the exercise of the Call Option; and (3) SEI failed to act diligently in securing the consent of the United States Army and the lenders to the exercise of the Call Option. Attorney Carlotti concluded his letter by stating that PIC would not consent to an extension of the July 30, 2002 deadline for exercising the Call Option. (Pls' Concise Statement, Tab S).

On July 29, 2002, SEI filed an adversary complaint against PIC in IT's bankruptcy proceeding alleging breach of the Repurchase Agreement.[9] Specifically, the adversary complaint (which set forth the same claims against PIC that are asserted by The Shaw Group and SEI in this case) alleged that PIC refused to cooperate with SEI in its efforts to determine whether to exercise the Call Option in the Repurchase Agreement by, *inter*

---

[9] According to PIC, the Bankruptcy Court abstained from hearing the adversary proceeding filed by SEI. (Df's Concise Statement, ¶ 13).

11

*alia*, failing to provide the information needed to calculate the Re-entry Price.[10]  (Df's Concise Statement, Exh. H).

The Call Option in the Repurchase Agreement was not exercised by July 30, 2002.  The Shaw Group maintains that PIC prevented it from exercising the Call Option, and "thereby reaped windfall profits by taking 100% of the profits earned by the Military Housing [Joint Venture], instead of splitting those

---

[10]Contrary to the clear language of the Asset Purchase Agreement dated January 23, 2002, the adversary complaint alleged that IT entered into the January 23rd Asset Purchase Agreement with SEI, rather than The Shaw Group.  (Df's Concise Statement, Exh. H, ¶ 13).

profits 50/50 with IT's successor."[11]  (Pls' Concise Statement, ¶ 21).

### III

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The party moving for summary judgment "always bears the initial responsibility of informing

---

[11]Based on the brief filed in opposition to PIC's motion for summary judgment, it is clear that SEI is no longer pursuing its claims against PIC in this case.  (Doc. 66).  With respect to SEI's apparent abandonment of its claims, the Court notes that, on August 12, 2005, SEI filed a motion, under Fed.R.Civ.P. 41(a)(2), seeking "leave to voluntarily dismiss all of its claims against PIC without prejudice" (Doc. No. 55), and that, on September 16, 2005, the motion was denied because (a) SEI offered no explanation for the requested dismissal without prejudice, (b) SEI did not act diligently in seeking the requested dismissal, (c) the motion for dismissal was filed shortly before the deadline for the filing of PIC's motion for summary judgment on the issue of liability, (d) the exhibits attached to PIC's memorandum of law in opposition to SEI's motion for voluntary dismissal without prejudice supported PIC's contention that SEI did not have any interest in the Repurchase Agreement that is the subject of this litigation, and (e) PIC had incurred substantial legal expenses to defend SEI's claims over a period of three years.  (Doc. 59).  In its reply memorandum in support of summary judgment, PIC maintains that SEI filed the motion for voluntary dismissal because SEI knew that it could not meet the financial condition precedent to the exercise of the Call Option in the Repurchase Agreement, and because SEI knew that IT had assigned its right, title and interest in the Repurchase Agreement to Shaw California.  (Doc. 69, p. 1).

the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Id. at 323.  The moving party can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  Id. at 322-324.  Once the moving party has met its burden, Fed.R.Civ.P. 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Id. at 324.  After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).

IV

PIC contends that it is entitled to judgment in its favor as a matter of law because neither The Shaw Group nor SEI possess any contractual rights under the Repurchase Agreement upon which

the claims in this case are based. After consideration, the Court agrees.[12]

The undisputed facts establish that (a) IT Corporation is the only IT entity which was a signatory to the Repurchase Agreement with PIC dated December 28, 2001; (b) under the terms of the Repurchase Agreement, The Shaw Group qualified as a permitted successor or assign of IT because it purchased all or substantially all of IT's privatization business and, in the Asset Purchase Agreement dated January 23, 2002, it assumed in writing IT Corporation's rights and obligations under the Repurchase Agreement; (c) on April 25, 2002, the Bankruptcy Court entered an Order approving the Asset Purchase Agreement between IT and The Shaw Group; (d) in the Bill of Sale, Assignment and Assumption Agreement dated May 3, 2002, IT Corporation assigned all of its rights, title and interest in the Repurchase Agreement with PIC to Shaw California as the designee of The Shaw Group; and (e) there is no claim that such assignment (or the designation of Shaw California by The Shaw Group to take right,

---

[12]PIC also contends that it is entitled to judgment as a matter of law because no "Shaw entity," including The Shaw Group and SEI, satisfied all of the conditions precedent to the exercise of the Call Option in the Repurchase Agreement. Because the Court concludes that neither plaintiff has standing to pursue this action, the Court finds it unnecessary to address this additional argument in support of PIC's motion for summary judgment.

15

title and interest in the Repurchase Agreement with PIC)[13] was invalid.

Based on these undisputed facts, neither The Shaw Group nor SEI possess any rights under the Repurchase Agreement, and, therefore, these entities do not have standing to sue for PIC's alleged breach of such agreement. *See, e.g.*, <u>Borkowski v. Fraternal Order of Police, Philadelphia Lodge No. 5</u>, 155 F.R.D. 105 (E.D.Pa.1994)(according to Pennsylvania contract law, a party lacks standing to pursue claims that arise out of a contract that was legally assigned); <u>West Penn Administration, Inc. v. Pittsburgh National Bank</u>, 289 Pa.Super. 460, 433 A.2d 896 (1981)(party could not maintain action after assignment); <u>Seligman v. McVeigh</u>, 1983 WL 41332 (Del.Super.1983)(generally, only a party to a contract has the right to sue for a breach); <u>Ostroff v. Federal Deposit Ins. Corp.</u>, 847 F.Supp. 270 (D.R.I. 1994)(when loan commitment was addressed to one plaintiff only, and was executed as accepted by that plaintiff only, other plaintiff was not party to that financing contract, and could not pursue claim that bank breached its financing contract); <u>Bosworth v. Norman</u>, 14 R.I. 521 (Supreme Ct.1884)(ordinarily, no person

---

[13]The Shaw Group's designation of Shaw California to take IT Corporation's right, title and interest in the Repurchase Agreement was in accord with the Bankruptcy Court's April 25, 2002 Order approving the sale of certain of IT's assets to The Shaw Group. As noted in footnote 5, the Order specifically provided that "[a]t or before Closing, [The Shaw Group] may designate one or more Designees to take title to the Assets...."

16

can sue for the breach of a contract who is not a party to it).[14]

Date: June *12*, 2006

_____
Arthur J. Schwab
United States District Judge
        for
William L. Standish
United States District Judge

---

[14] PIC is a Rhode Island corporation with a principal place of business in Rhode Island, and IT was a Delaware corporation with a principal place of business in Pennsylvania at the time of the execution of the Repurchase Agreement. Although the Repurchase Agreement does not contain a choice of law provision, the Court declines to engage in a choice of law analysis because the law of the relevant jurisdictions concerning standing to sue for breach of contract is consistent and plaintiffs do not contend otherwise.